<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LAURA K. MORETZ, <br><br>               Plaintiff, <br><br>       v. <br><br> TRUSTEES OF PRINCETON d/b/a PRINCETON UNIVERSITY and MICHAEL RYAN, *et al.*, <br><br>           Defendants. | Civil Action No. 21-19822 (GC) (TJB) <br><br> <u>**OPINION**</u> |

<u>**CASTNER, U.S.D.J.**</u>

**THIS MATTER** comes before the Court upon the Motions to Dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) filed by Defendants Princeton University and Michael Ryan.  (ECF Nos. 18 & 19.)  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' motions are **GRANTED** in part and **DENIED** in part.

**I.**      <u>**BACKGROUND**</u>

This suit involves claims of negligence, emotional distress, and breach of fiduciary duty brought by a former undergraduate student at Princeton University who alleges that she was sexually assaulted by then-Professor Michael Ryan.

A. FACTUAL BACKGROUND[1]

In the spring of 1980,[2] Plaintiff Laura K. Moretz was nineteen years old and an undergraduate sophomore at Princeton University in Princeton, New Jersey. (ECF No. 14 ¶¶ 32-34.) After submitting "a few poems to the Princeton Creative Writing Department," Ms. Moretz "was accepted in the spring writing workshop and assigned a workshop section." (*Id.* ¶¶ 34-35.) At the encouragement of a friend and based on the advice of an administrator, Ms. Moretz sought to be reassigned to the workshop section of Michael Ryan, a new professor at Princeton and an "award-winning poet" who was said to have the "best" writing class. (*Id.* ¶¶ 35-37.) Ms. Moretz visited Professor Ryan's office to ask if he would approve the switch. (*Id.* ¶ 37.)

During their meeting, Professor Ryan stared "uncomfortably" at Ms. Moretz before agreeing to her reassignment and directing her to attend his first class. (*Id.* ¶ 37.) At that first class, Professor Ryan informed Ms. Moretz and the other students that they were expected to meet with him for "frequent one-on-one conferences." (*Id.* ¶ 38.) When Ms. Moretz had her initial one-on-one conference, Professor Ryan had a "searing stare" and said that he would "like to feel [her] energy." (*Id.* ¶ 39.) Professor Ryan then "asked [Ms. Moretz] out" for drinks. (*Id.* ¶ 40.) "[A]wkward and unsure . . . how to respond," Ms. Moretz "hesitantly accepted and agreed to meet [Professor Ryan] at the University's 'front gate' the following evening." (*Id.* ¶¶ 39-40.)

The following evening, Professor Ryan "arrived at the front gate in his red sports car" and drove Ms. Moretz to his apartment without letting her know their destination in advance. (*Id.* ¶ 41.) Once at the apartment, Professor Ryan pulled the phone jack out of the wall, plied Ms. Moretz

---

[1]     The factual background is taken from Plaintiff's Amended Complaint. When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court accepts as true all well-pleaded facts in the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[2]     In 2019, the New Jersey Legislature created a two-year revival window for parties to sue based on sexual abuse that would otherwise be time-barred. *See* N.J. Stat. Ann. § 2A:14-2b(a).

with wine, and tried to establish emotional intimacy during their conversation. (*Id.* ¶¶ 42-45.) Ms. Moretz was "panicked" and sought to "drown[] her fear with steady sips of wine." (*Id.* ¶ 43.) Professor Ryan eventually took Ms. Moretz's "wine glass from her hand" and proceeded to sexually assault her.[3] (*Id.* ¶¶ 46-50.)

Days later, Professor Ryan called Ms. Moretz even though she had not given him her telephone number. (*Id.* ¶ 53.) He asked her to come "over to his apartment." (*Id.*) Ms. Moretz agreed in an "effort to regain some control." (*Id.*) After Professor Ryan suggested that Ms. Moretz smoke marijuana with him, she "consented to sex" in another attempt "to reclaim her power." (*Id.* ¶¶ 54-55.) Professor Ryan proceeded to "mock[] [Ms. Moretz's] sexual immaturity and further humiliated her." (*Id.* ¶ 55.) Despite this abuse, Ms. Moretz remained in Professor Ryan's writing class, which she passed. (*Id.* ¶ 56.)

At some point, Ms. Moretz confided in the "director/administrator of the Princeton University Women's Center and reported the sexual misconduct." (*Id.* ¶ 57.) Ms. Moretz was "advised . . . that two other students had recently reported sexual misconduct by . . . [Professor] Ryan and that [Ms. Moretz's] complaint was 'too late.'" (*Id.* ¶ 58 (emphasis removed).) In or around May 1981, Professor Ryan was discharged by Princeton "for sexual harassment, including but not limited to, having sex with students in violation of the Rules and Procedures of the Faculty and violating 'teaching ethics'" by sexually harassing students. (*Id.* ¶ 9 (emphasis removed).)

As a result of the abuse, Ms. Moretz has "suffered from difficulty navigating intimate relations and vulnerability" in addition to "severe emotional distress, extreme trauma, depression, anxiety, post-traumatic stress disorder, humiliation, embarrassment, fear, emotional dissociation,

---

[3]     Because it is not necessary at this juncture, the Court does not describe the alleged assault in graphic detail.

. . . loss of self-esteem and self-worth, all of which . . . require[d] counseling, therapy, and . . . other treatment," which disrupted Ms. Moretz's life.  (*Id.* ¶¶ 71-76.)

### B.  PROCEDURAL BACKGROUND

On November 4, 2021, Plaintiff filed a Complaint in the Law Division of the New Jersey Superior Court, Mercer County, against Defendants Princeton University and Professor Ryan as well as still-unidentified other persons and institutions who are alleged to share responsibility. (ECF No. 1 at 7-30.[4])  Princeton removed the action to federal court on November 8, 2021, based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.  (*Id.* at 1-4.)

Both Princeton and Professor Ryan moved to dismiss in February 2022, and Plaintiff then filed the Amended Complaint, which is the operative pleading.[5]  (ECF Nos. 11, 13, 14.)  The Amended Complaint asserts four causes of action.  Count One is for Negligent Hiring, Supervision, and/or Retention, asserted against Princeton.  (ECF No. 14 ¶¶ 85-93.)  Count Two is for Gross Negligence, Count Three is for Emotional Distress, and Count Four is for Breach of Fiduciary Duty; these three counts are asserted against both Princeton and Professor Ryan.  (*Id.* ¶¶ 94-106.)

In March 2022, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6).  (ECF Nos. 18 & 19.)  Ms. Moretz opposed on April 4, 2022, and Defendants replied. (ECF Nos. 20-22, 26.)  On multiple occasions since the close of briefing, the Court has allowed the parties to address relevant decisions from other courts, with the most recent supplemental brief having been received on February 17, 2023.  (ECF Nos. 29-31, 34, 38-40.)

---

[4]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[5]    Due to the Amended Complaint, the Court administratively terminated the pending motions to dismiss without prejudice and instructed Defendants to respond to the operative pleading.  (ECF No. 15.)

II.    **LEGAL STANDARD**

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

III.    **DISCUSSION**

A.    COUNT ONE—NEGLIGENT HIRING, SUPERVISION, AND/OR RETENTION

Under New Jersey law,[6] "negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer." *G.A.-H. v. K.G.G.*, 210 A.3d 907, 916 (N.J. 2019).

For negligent hiring or retention, "the plaintiff must show: (1) that the employer 'knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons' and (2) 'that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury.'" *Id.* (quoting *Di Cosala v. Kay*, 450 A.2d 508, 515 (N.J. 1982)). "Critically, timing is important in tort of negligent retention. The employee's incompetence, unfitness, or dangerous attribute must be known to the employer *before* the employee takes the action which causes a plaintiff's injury." *Westberry v. State Operated Sch. Dist. of Newark*, Civ. No. 15-07998, 2017 WL 2216395, at *11 n.11 (D.N.J. May 19, 2017) (emphasis in original).

For negligent supervision or training, "the plaintiff must satisfy what is essentially the same standard, but framed in terms of supervision or training. That is to say, the plaintiff must prove that (1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages." *G.A.-H.*, 210 A.3d at 916 (citations omitted). Because these claims are

---

[6]    The parties cite New Jersey law, and the Court finds that the common-law claims for wrongs allegedly committed in New Jersey are appropriately analyzed under the law of New Jersey in this diversity action. *See Stephens v. Clash*, 796 F.3d 281, 289 (3d Cir. 2015) ("[A] federal court must apply the substantive laws of its forum state in diversity actions . . . ." (quoting *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007))).

separate from the theory of *respondeat superior*, an employer's "liability for negligent supervision may properly be based on actions taken by an employee outside the scope of their employment." *Simonson v. Formisano*, Civ. No. 20-20480, 2021 WL 2221328, at *5 (D.N.J. June 1, 2021).

Princeton's primary basis to dismiss the negligent hiring, supervision, and/or retention claims is that they are barred by New Jersey's Charitable Immunity Act ("NJCIA"), N.J. Stat. Ann. § 2A:53A-7, where a plaintiff, like Ms. Moretz, is "a beneficiary of the University's works at the time of the incident[s] underlying the" claims. (ECF No. 19-1 at 18-19.) Plaintiff concurs with Princeton's assessment that "Section 7.4 [of] the [NJ]CIA limits [claims for] simple 'negligent hiring, supervision, or retention' [claims] to children under the age of 18," but she points to "Section 7(c) of the [NJ]CIA [that] makes clear that a charitable entity or trust . . . can be held directly liable for its 'grossly negligent' acts." (ECF No. 21 at 9 (citing N.J. Stat. Ann. §§ 2A:53A-7, 7.4).) She contends that, in accordance with Section 7(c), "Princeton University should not escape liability for its grossly negligent hiring, supervision, or retention of their employee that resulted in a sexual offense." (*Id.* at 11.)

The Court agrees that Princeton can be held liable under the NJCIA for its grossly negligent actions, including for the grossly negligent hiring, supervision, or retention of Professor Ryan. In this case, the appropriate vehicle for a claim predicated on the University's alleged grossly negligent actions is Count Two for "Gross Negligence," not Count One for "Negligent Hiring, Supervision, and/or Retention." As Plaintiff acknowledges, a claim for simple negligent hiring, supervision, and/or retention, as in Count One, is subject to the charitable immunity bar in the NJCIA when it is pursued by a "person" who "is a beneficiary . . . of the works" of a "nonprofit corporation . . . organized exclusively for . . . educational purposes," such as Princeton University. N.J. Stat. Ann. § 2A:53A-7(a); *see also Zhang v. Ridgewood YMCA*, 2011 WL 589586, at *4 (N.J. Super. Ct. App. Div. Feb. 22, 2011) ("There is no dispute before us regarding the applicability of

the [NJ]CIA. . . .  The issues before [the court] are therefore limited to medical causation and gross negligence.  Further, . . . appellant has narrowed her gross negligence theory to negligent hiring.").  This conclusion is supported by New Jersey case law interpreting charitable immunity as well as the NJCIA's legislative history.

In *Schultz v. Roman Catholic Archdiocese of Newark*, a child at a parish school was sexually abused by one of his instructors.  472 A.2d 531, 532 (N.J. 1984).  After the child committed suicide, a suit was brought, alleging that the Roman Catholic Archdiocese of Newark, which owned and operated the school, "was reckless, careless, and negligent in hiring [the instructor who committed the abuse] and . . . in failing to supervise him."  *Id.*  Detailing the history of charitable immunity in the State, the New Jersey Supreme Court concluded that the Archdiocese could not be held liable for "negligence in hiring," because the claim was barred by the NJCIA, which is designed "to be 'remedial and . . . liberally construed so as to afford immunity for the protection of nonprofit corporations.'"  *Id.* at 536-39 (citation omitted).

Writing in dissent, Justice Handler took issue with the majority's suggestion that the NJCIA immunizes "anything other than ordinary negligence."  *Id.* at 538.  His position was that the statute did "not mention other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior" and thus "it [wa]s readily inferable that the Legislature did not intend to provide by statute an immunity covering aggravated forms of wrongful conduct."  *Id.*

More than two decades after *Schultz* was decided, the New Jersey Legislature amended the NJCIA in 2006 to exclude from charitable immunity claims for "negligent hiring, supervision or retention against a person under the age of [eighteen] who is a beneficiary of the nonprofit organization."  N.J. Stat. Ann. § 2A:53A-7.4.  The Assembly sponsors explained that they were amending the NJCIA in response to *Schultz* and intended to "provide that the Charitable Immunity

8

Act would not apply in cases involving the negligent hiring, supervision or retention of any employee . . . when such negligence caused the sexual molestation of a person under [eighteen] years of age." *Assembly Sponsor Statement on A.B. 2512* (L. 2005, c. 264); *see also C.P. v. Governing Body of Jehovah's Witnesses*, 2023 WL 7584423, at *1 (N.J. Super. Ct. App. Div. Nov. 15, 2023) ("In 2006, the [NJ]CIA was again amended to provide an exception to immunity for negligence claims where the supervision, hiring, and retention of an employee, agent, or servant led to sexual abuse.").

Shortly after the Legislature amended the NJCIA, the New Jersey Supreme Court again considered the scope of charitable immunity in *Hardwicke v. American Boychoir School,* which involved claims that a boarding school's musical director had sexually abused a child. 902 A.2d 900 (N.J. 2006). The *Hardwicke* Court described the disagreement in *Schultz* as centering "on the characterization of the tort at issue in the case—the intentional act of the instructor (the dissent) or the alleged negligent hiring by the Archdiocese (the majority)." *Id.* at 917. Adopting Justice Handler's position in the *Schultz* dissent, the *Hardwicke* Court held that the NJCIA "immunizes simple negligence only, and not 'other forms of aggravated wrongful conduct,'" such as "'grossly negligent behavior.'" *Id.* (citation omitted). And the Court found that, under the 2006 amendment to the NJCIA, the plaintiff could pursue "a claim for negligent hiring, supervision and retention against the School" because the plaintiff had been a minor when the abuse occurred. *Id.* at 918 ("[W]e hold that the [NJ]CIA immunizes charitable entities for negligence only, and that under the 2006 amendment plaintiff has a claim for negligent hiring, supervision and retention against the School.").

Two years later, Judge Skillman reiterated for the New Jersey Appellate Division that adult plaintiffs who are beneficiaries of a charitable organization at the time of alleged sexual assault by an agent of the charitable organization cannot maintain claims for negligent hiring, supervision, or

retention, because these claims sound in simple negligence and are barred by charitable immunity. *See P.V. ex rel. T.V. v. Camp Jaycee*, 922 A.2d 761, 766 n.3 (N.J. Super. Ct. App. Div. 2007), *aff'd*, 962 A.2d 453 (N.J. 2008) ("Since plaintiffs' brief indicates that [the victim] is a twenty-year-old female, the present case would not fall within this exception to the Charitable Immunity Act even if plaintiffs' complaint could be read to assert a claim for Camp Jaycee's alleged negligent hiring, supervision or retention of employees."); *see also C.P.*, 2023 WL 7584423, at *5 (finding that the plaintiff's claims for negligent hiring and retention stemming from abuse the plaintiff suffered as a child were "not cognizable" until the NJCIA was amended in 2006 to remove immunity for such claims).

In the present case, because Plaintiff does not dispute that (1) she was an adult at the time of the alleged assault, (2) Princeton is devoted to educational purposes, (3) she was a beneficiary of Princeton's educational works as a student, and (4) Princeton was promoting its educational objectives when it hired and retained Professor Ryan to teach at the University, the simple negligent hiring, supervision, and retention claims in Count One are dismissed without prejudice as barred by charitable immunity under the NJCIA. *See, e.g.*, *Franco v. Fairleigh Dickinson Univ.*, 248 A.3d 1254, 1269 (N.J. Super. Ct. App. Div. 2021) ("[W]hen FDU is promoting education, a beneficiary of that education cannot sue FDU or its employees for negligence.").

## B. COUNT TWO—GROSS NEGLIGENCE

For negligence or gross negligence,[7] a plaintiff must plausibly plead that "the defendant breached a duty of care and that the breach was the actual and proximate cause of damages to the plaintiff." *K.J. v. J.P.D.*, Civ. No. 20-14177, 2023 WL 2387397, at *4 (D.N.J. Mar. 7, 2023)

---

[7]    Charitable immunity under the NJCIA does not bar claims for gross negligence. *See* N.J. Stat. Ann. § 2A:53A-7(c) ("Nothing in this section shall be deemed to grant immunity . . . [for] willful, wanton or grossly negligent act of commission or omission, including sexual assault.").

(quoting *Kinney Bldg. Assocs., L.L.C. v. 7-Eleven, Inc.*, Civ. No. 15-7917, 2016 WL 2855063, at *4 (D.N.J. May 16, 2016)).

"Whereas negligence is 'the failure to exercise ordinary or reasonable care' that leads to a natural and probable injury, gross negligence is 'the failure to exercise slight care or diligence.'" *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 754 (N.J. 2016) (citation omitted). This means that, to establish a viable claim of gross negligence, a plaintiff must plead "something more than 'inattention' or 'mistaken judgment,'" but need "not [plead] willful or wanton misconduct or recklessness." *Id.* (citation omitted). In other words, a gross negligence claim can be maintained if a plaintiff shows that a defendant has exhibited "an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission." *Id.*; *see also In re N.J.A.C. 12:17-2.1.*, 160 A.3d 727, 738 (N.J. Super. Ct. App. Div. 2017) ("Although rigid classifications of the 'degrees of negligence have been abandoned' in our case law, the term 'gross negligence' is nonetheless still used when referring to 'the upper reaches of negligent conduct.'" (citing *Stelluti v. Casapenn Enterprises, LLC*, 975 A.2d 494, 508 n.6 (N.J. Super. Ct. App. Div. 2009))).

Here, the Court finds that Plaintiff has pleaded sufficient factual matter to support the inference that Princeton University and Professor Ryan failed to exercise scant care or diligence and that Plaintiff suffered natural and probable injury as a result of this failure. At this stage, the gross negligence cause of action can proceed against both Defendants.

Notably, Plaintiff alleges that she was a nineteen-year-old undergraduate student who was owed duties of reasonable care by Princeton and Professor Ryan, including duties to ensure that she and other students were protected from known harassment, discrimination, and threats of physical as well as psychological harm. As to Princeton, Plaintiff alleges that despite the University having been informed at some point by at least two other students that Professor Ryan

had engaged in "sexual misconduct," the University had not independently reached out to Plaintiff to warn her about Professor Ryan or to check whether Plaintiff, a known female member of one of Professor Ryan's classes, had been the victim of similar misconduct as others.  Then, when Plaintiff decided of her own volition to inform the director/administrator of Princeton University's Women's Center that she had been abused, the alleged response was that her complaint was "too late," because there had been earlier reports.  Princeton's alleged inaction and failure to take basic steps to protect Plaintiff raises the gross negligence claim above a speculative level.  *See, e.g.*, *Sines v. Darling Ingredients Inc.*, Civ. No. 19-19121, 2020 WL 5015488, at *5 (D.N.J. Aug. 25, 2020) ("Defendant's apparent inaction and thus apparent reckless disregard for the safety and well-being of Plaintiffs . . . raise this claim of gross negligence, above a speculative level and thus, the Court will allow this claim to go forward at this time."); *see also Powell v. Seton Hall Univ.*, Civ. No. 21-13709, 2022 WL 16922100, at *4 (D.N.J. Nov. 14, 2022) (student-athlete stated plausible claim for gross negligence against University, basketball coach, and director of sports medicine where the student-athlete suffered a serious knee injury and the defendants repeatedly advised him it was a bone bruise and to keep playing even though they allegedly knew extent of the injury). Likewise, Plaintiff has asserted a plausible claim for gross negligence against Professor Ryan as Plaintiff claims that he sexually abused her, and took advantage of his position of power over her and wholly disregarded the duties he owed as an educator.  *See, e.g.*, *Smith v. Kroesen*, Civ. No. 10-5723, 2015 WL 4913234, at *4 (D.N.J. Aug. 18, 2015).

### C.  Count Three—Emotional Distress

There are four elements for a claim of intentional infliction of emotional distress ("IIED"). First, a plaintiff must plausibly plead "that [the] defendant acted intentionally or recklessly." *Ingraham v. Ortho-McNeil Pharm.*, 25 A.3d 1191, 1195 (N.J. Super. Ct. App. Div. 2011) (citing *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988)).  "Defendant must intend

'both to do the act and to produce emotional distress.'" *Id.* "A defendant may also be liable when he [or she] 'acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.'" *Id.* Second, a plaintiff must plausibly plead that the "defendant's conduct was 'extreme and outrageous.' The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* Third, the "defendant's conduct . . . [must be] a proximate cause of plaintiff's emotional distress." *Id.* Fourth, "the emotional distress suffered . . . must be so severe that no reasonable [person] could be expected to endure it." *Id.*

### 1. PROFESSOR RYAN

Professor Ryan argues that the IIED claim against him should be dismissed because "[t]he actions described by . . . [Ms. Moretz] indicate a consensual encounter, and conduct that was not outrageous as defined by applicable law." (ECF No. 18-1 at 9-10.) He submits that Plaintiff has not plausibly pleaded the first two elements of the IIED claim, because "[g]iven the facts . . . , there could be no intent to inflict any kind of injury." (*Id.* at 10.) The Court disagrees.

When Plaintiff's allegations are accepted as true, as is required at this stage, Plaintiff has stated sufficient facts detailing a sexual assault by an individual who could be found to have acted recklessly and in deliberate disregard of the emotional distress that would follow. (ECF No. 14 ¶ 48.) Plaintiff alleges that because of the abuse she has suffered "severe emotional distress, extreme trauma, depression, anxiety, post-traumatic stress disorder," and more. (*Id.* ¶ 73.) If proven, Professor Ryan's conduct could satisfy the elements of an IIED claim.

Recently, in *Bernard v. Cosby*, the defendant was alleged to have drugged and sexually assaulted a woman he had offered to mentor. 648 F. Supp. 3d 558, 563 (D.N.J. 2023). Denying the motion to dismiss, the court underscored that "[a]n IIED claim may be premised on sexual conduct," and it found that the allegations that the defendant had "intentionally served [the

plaintiff] a beverage that caused her to lose consciousness and thereafter assaulted her" were "sufficient to support [the] IIED claim at the dismissal stage." *Id.* at 575 (citing *Wilson v. Parisi*, 633 A.2d 113, 115 (N.J. Super. Ct. App. Div. 1993)).

Here, even though Plaintiff does not allege that she lost consciousness, the circumstances of her alleged sexual assault are, like those in *Cosby*, "so outrageous in character" as to maintain her IIED claim past the dismissal stage—Professor Ryan took advantage of his authority over a young student, transported her to his apartment without informing her where they were going, pulled the telephone chord out of the wall once they were in the apartment, furnished the student with alcohol, and then ignored her protestations as he sexual assaulted her. Such alleged conduct is sufficient to plausibly plead an IIED claim. *See, e.g.*, *Wigginton v. Servidio*, 734 A.2d 798, 801 (N.J. Super. Ct. App. Div. 1999) (finding that IIED claim could be maintained based on single alleged incident of sexual harassment combined with the plaintiff's intense reaction). Accordingly, Professor Ryan's motion to dismiss the IIED claim in Count Three is denied.

## 2.    *PRINCETON UNIVERSITY*

Princeton argues that the IIED claim against it should be dismissed because Plaintiff does not plead "any facts suggesting that the University engaged in outrageous, intentional conduct." (ECF No. 19-1 at 27-28.) Plaintiff's allegations against Princeton, it contends, comprise "complain[t]s about omissions or inaction by the University, not intentional activity." (*Id.* at 28.)

In opposition, Plaintiff does not cite case law that has found that an IIED claim could be maintained against a university under similar circumstances, nor does she meaningfully rebut Princeton's contention that it was Professor Ryan's sexual assault, and not anything that Princeton intentionally did to her, that caused the emotional distress. (ECF No. 21 at 18-20.) Plaintiff highlights certain allegations in her Amended Complaint wherein she claims that Princeton acted "[r]ecklessly," but these are largely conclusory recitals of the elements of an IIED claim and do

not contain sufficient factual matter for the Court to infer that it is plausible for an IIED claim to be maintained against Princeton.  (*Id.* at 19-20.)

Ultimately, Plaintiff has failed to proffer allegations sufficient to demonstrate that Princeton acted with the requisite intent to cause her emotional distress or that it acted in deliberate disregard of a high degree of probability that emotional distress would follow from its actions. *Buckley*, 544 A.2d at 863; *see also M.H. by D.H. v. C.M.*, Civ. No. 20-01807, 2020 WL 6281686, at *11 (D.N.J. Oct. 27, 2020) ("[N]othing in the Complaint indicates the Moving Defendants recklessly allowed or intended for any of this to happen to M.H.  The Court finds Plaintiff has failed to state a claim for intentional infliction of emotional distress."); *Doe v. Dennis-Yarmouth Reg'l Sch. Dist.*, 578 F. Supp. 3d 164, 182 (D. Mass. 2022) ("The Does have not alleged sufficient facts to state a plausible claim that the individual defendants intended that their conduct would cause emotional distress to Jane or that their conduct was beyond all bounds of human decency. While the sexual assault was tragic, at worst the individual defendants were negligent for failing to supervise . . . .").

 To the extent Plaintiff seeks to pursue an IIED claim against Princeton via the doctrine of *respondeat superior* and to thereby hold Princeton vicariously liable for Professor Ryan's alleged tortious actions, such an approach is not supported by relevant authority.  Although employers may be liable for torts committed by their employees within the scope of their employment, courts in New Jersey have recognized that "[o]nly rarely will intentional torts fall within the scope of employment."  *Davis v. Devereux Found.*, 37 A.3d 469, 490 (N.J. 2012).

Here, Plaintiff does not proffer allegations that support the inference that Professor Ryan's alleged sexual assault was within the scope of his employment by Princeton University.  She does not allege that Professor Ryan's actions were of the kind he was employed to perform; that the alleged sexual assault occurred within the authorized time or space limits of his employment; that

the assault was motivated by a desire to serve the University; or that his actions were expected. Under similar circumstances, courts have rejected claims against employers sounding in tort based on vicarious liability. *See, e.g.*, *Cosgrove v. Lawrence*, 522 A.2d 483, 484-85 (N.J. Super. Ct. App. Div. 1987) ("[A]s a matter of law, sexual relations . . . [between the social worker therapist and his client] were not conduct of the kind [the therapist] was employed to perform within the scope of his employment."); *see also Doughty v. U.S. Postal Serv.*, 359 F. Supp. 2d 361, 366-67 (D.N.J. 2005) ("New Jersey law squarely dictates that [the defendant] was acting outside his scope of postal employment when he visited a fellow postal employee during non-working hours, at her home, using a pretext that had nothing to do with his employment, and allegedly assaulted her."); *Roe ex rel. Roe v. Rutgers, State Univ. of New Jersey*, Civ. No. 13-1762, 2013 WL 3446456, at *5 (D.N.J. July 9, 2013) ("Plaintiffs fail to establish a viable claim against Rutgers for the intentional torts of sexual assault, assault, and invasion of privacy.  Although Stubblefield was a Rutgers employee, her actions were allegedly intentional and not within the scope of her employment.").

Finally, Plaintiff's invocation of the "aided-by-agency" doctrine is also unavailing.  (ECF No. 21 at 12-15.)  She argues that Princeton can be held liable for IIED because Professor Ryan "leverage[ed] his power and agency position," which "is the textbook definition of 'aided agency.'"  (*Id.* at 15.)  While this doctrine of vicarious liability has been recognized by the New Jersey Supreme Court in select circumstances, the Court "has never applied the aided-by-agency exception to employer nonliability in any circumstance other than those remedial statutes designed to eradicate workplace discrimination and harassment, to protect conscientious employees, or to *protect children* from abuse by those *in loco parentis*."  *E.S. for G.S. v. Brunswick Inv. Ltd. P'ship*, 263 A.3d 527, 541 (N.J. Super. Ct. App. Div. 2021) (first emphasis added); *see also Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Grp. Inc.*, 226 F. App'x 192, 198 (3d Cir. 2007) ("[T]he New Jersey Supreme Court's application of § 219(2)(d) in these cases appears to be a discrete effort to realize

and effectuate the policies giving rise to those statutory schemes rather than an endorsement of applying § 219(2)(d) to all *respondeat superior* situations.")  As New Jersey's Appellate Division has detailed, the "aided-by-agency" doctrine was "repudiat[ed]" by the American Law Institute in the *Restatement Third*, and the doctrine's continued vitality is at issue in different states.  *E.S. for G.S.*, 263 A.3d at 541 ("Courts have split on the continued vitality of the 'aided-by-agency' exception to an employer's nonliability in light of the *Restatement Third*.")  Considering the sparing approach courts have taken to the "aided-by-agency" doctrine, *see, e.g.*, *P.J. v. City of Jersey City*, Civ. No. 21-20222, 2022 WL 16949544, at *6 (D.N.J. Nov. 15, 2022) ("Courts that *have* adopted the aided-by-agency theory have interpreted it narrowly and sparingly."), and because Ms. Moretz was not a child at the time of the alleged assault and does not point to any New Jersey case law applying the doctrine in similar circumstances, the Court finds the doctrine inapplicable.  Accordingly, the IIED claim in Count Three against Princeton University is dismissed without prejudice.

### 3.  *Negligent Infliction of Emotional Distress*

Count Three of the Amended Complaint is for "emotional distress" and refers to distress that was "negligently and/or recklessly inflicted."  (ECF No. 14 ¶ 97.)  In moving to dismiss, Professor Ryan argues that claims for both intentional infliction *and* negligent infliction of emotional distress fail.  (ECF No. 18-1 at 9-16.)  Princeton's arguments for dismissal focus solely on reasons why an IIED claim fails.  (ECF No. 19-1 at 27-28.)  In opposition, Plaintiff does not defend a negligent infliction of emotional distress claim; she refers simply to an IIED claim.  (ECF No. 20 at 9-10; ECF No. 21 at 18-20.)

Because Ms. Moretz did not respond to Professor Ryan's arguments as to why a negligent infliction of emotional distress claim was not plausibly pleaded and because she has given no clear indication that she intended to plead anything other than an IIED claim in Count Three, the Court

will dismiss any negligent infliction of emotional distress claim without prejudice against both Defendants. *See Sevajian v. Castro*, Civ. No. 20-1591, 2022 WL 17733675, at *3 n.1 (D.N.J. Dec. 6, 2022) ("Plaintiff appears to have abandoned his negligent hiring claim, as he did not offer any argument in opposition to Defendants' motion to dismiss this claim."); *Totalogistix, Inc. v. Marjack Co.*, Civ. No. 06-5117, 2007 WL 2705152, at *3 (D.N.J. Sept. 14, 2007) (Greenaway, J.) ("It appears that Plaintiff has dropped this claim, as Plaintiff offers no defense in its opposition papers to Defendant's arguments.").

### D.  COUNT FOUR—BREACH OF FIDUCIARY DUTY

For breach of fiduciary duty, a plaintiff must plausibly allege "1) the existence of a fiduciary duty or relationship between the parties; 2) breach of that duty; and 3) resulting damages." *Read v. Profeta*, 397 F. Supp. 3d 597, 633 (D.N.J. 2019) (citation omitted).  The New Jersey Supreme Court has explained that "[a] fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997).  "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." *Id.* at 703-04.

Both Princeton and Professor Ryan take the position that, "[a]s a matter of law, a university [and its professors] do[] not have the 'requisite relationship of trust and confidence' with [their] students that give[] rise to a breach of fiduciary duty claim." (ECF No. 19-1 at 29 (quoting *Thomas v. Nova Se. Univ.*, 468 F. App'x 98, 100 (3d Cir. 2012)); ECF No. 18-1 at 16-17.)  In opposition, Plaintiff argues that she "was a vulnerable sophomore student at a prestigious University attending a class with a venerated teacher," and this "is sufficient . . . to support [her] contention that there was a fiduciary relationship present." (ECF No. 20 at 11-12; ECF No. 21 at 21-22.)

Whether a university and its faculty owe their students a fiduciary duty—as opposed to contractual duties or ordinary duties to exercise reasonable care—is a question that courts have grappled with to somewhat differing results.  The majority position, as far as this Court can tell, is that there typically does not exist a fiduciary relationship between post-secondary institutions and their adult students.  Indeed, in a variety of contexts, ranging from disciplinary proceedings to allegations of defamation, state and federal courts have declined to recognize fiduciary relationships between students, faculty, and universities/colleges.  *See, e.g.*, *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 67 (1st Cir. 2020) (no fiduciary duty between college and students where officials had concealed that college was on brink of insolvency); *Flood v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 15-00890, 2015 WL 5785801, at *11 (M.D. Pa. Aug. 26, 2015), *report and recommendation adopted*, 2015 WL 5783373 (M.D. Pa. Sept. 30, 2015) (no fiduciary relationship between NCAA that oversees intercollegiate athletics and "the thousands of student athletes who participate in those sports"); *Knelman v. Middlebury Coll.*, 570 F. App'x 66, 68 (2d Cir. 2014) (no fiduciary relationship between the college/coach and the student allegedly dismissed from hockey team without being afforded due process—"[w]hile schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim"); *Vurimindi v. Fuqua Sch. of Bus.*, Civ. No. 10-234, 2010 WL 3419568, at *7 (E.D. Pa. Aug. 25, 2010), *aff'd*, 435 F. App'x 129 (3d Cir. 2011) (no fiduciary duty where student was allegedly defamed by his classmates and university took no action—"university personnel do not owe a fiduciary duty to students under Pennsylvania law" (citing *Manning v. Temple Univ.*, Civ. No. 03-4012, 2004 WL 3019230, at *10 (E.D. Pa. Dec. 30, 2004))); *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 716 (S.C. 2003) (relationship between academic advisor and student not a fiduciary one where advisor allegedly provided negligent advice about which classes to take).

Nevertheless, there are instances when courts have found that the nature of the relationship alleged between a student and a post-secondary institution or faculty member has given rise to the special relationship of "trust and confidence" that underpins a fiduciary duty. This is particularly the case when students' work has been misappropriated by their educators. *See, e.g.*, *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1362-63 (Fed. Cir. 2001) (finding that doctoral research student adequately pleaded a fiduciary duty against professor and university based on alleged wrongful conduct of her supervisor and department chair when the chair "had specifically represented to [student] that he would protect and give her proper credit for her research and inventions" and then did the opposite); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 97-98 (D. Conn. 2000) (finding that Yale University and professors could owe fiduciary duty to graduate student who alleged that professors "misappropriated his ideas").

In the context of a student's allegations of sexual assault or harassment by a faculty member, courts reflect this general split. In *Williamson v. Bernstein*, for example, the Massachusetts Superior Court granted Fitchburg State College's motion to dismiss the breach of fiduciary duty claim brought against it by a former student who alleged that she had been manipulated and induced to engage in sexual relations by her psychology professor. 1996 WL 1185104, at *1 (Mass. Super. Feb. 20, 1996). The court found that there was "no fiduciary duty running from the College" to its former student and there was "no more support for the proposition that an individual teacher is a fiduciary for his or her students then there is for the proposition that the institution itself is a fiduciary." *Id.* at *3-4 n.8.

In contrast, in *Schneider v. Plymouth State College*, the New Hampshire Supreme Court found that a student who had been intimidated and sexually harassed by a professor could state a claim for breach of fiduciary duty against Plymouth State College. 744 A.2d 101, 105 (N.H. 1999). Emphasizing that students are in a vulnerable position because of the power differential with

20

faculty who expect deference and handout grades, the Court concluded that the relationship between students and college faculty "gives rise to a fiduciary duty on behalf of [colleges and universities] to create an environment in which [students] could pursue [their] education free from sexual harassment by faculty members."[8] *Id.* at 105-06.

In New Jersey, no state court appears to have addressed whether a university owes a fiduciary duty to an adult student who alleges sexual harassment and/or sexual assault by a faculty member. And federal courts applying New Jersey law have generally found, like the majority of courts elsewhere, that no fiduciary relationship exists between universities and their students. In *Thomas v. Nova Southeastern University*, for example, a panel of the Third Circuit Court of Appeals identified no support for the proposition that the university owed a fiduciary duty to a student who alleged that the university had not provided the full tuition-refund he was allegedly owed. 468 F. App'x 98, 100 (3d Cir. 2012); *see also Boateng v. Bergen Cnty. Cmty. Coll.*, Civ. No. 15-2304, 2016 WL 7217606, at *2 (D.N.J. Dec. 13, 2016) (dismissing student's fiduciary duty claim stemming from "handling of her financial aid application, verification of her application information, and the award of her grants and loans"). Similarly, in *Powell v. Seton Hall University*, the district court found that no fiduciary duty existed where two student-athletes, players on the

---

[8]    Several courts since *Schneider* have sought to distinguish the New Hampshire decision. In *Valente v. University of Dayton*, for example, the United States Court of Appeals for the Sixth Circuit found *Schneider*'s logic inapplicable to an honor code dispute where the student was suspended after being found to have cheated on an exam. 438 F. App'x 381, 387 (6th Cir. 2011). The Sixth Circuit could not identify any Ohio case law "where courts ha[d] applied [the fiduciary relationship] to the university-student context," and it found this "telling," particularly due to "Ohio courts' hesitancy to impose fiduciary duties outside their traditional contexts." *Id.* Similarly, in *Leary v. Wesleyan University*, the Superior Court of Connecticut characterized *Schneider* as inapplicable, and it found no fiduciary relationship between the university and the student who complained to school safety officers of a panic attack, was transported to the hospital without further investigation, and later committed suicide after leaving the hospital. 2009 WL 865679, at *10-12 (Conn. Super. Ct. Mar. 10, 2009). The court wrote that the facts did "not demonstrate the fraudulent, self-dealing or conflict of interest situations" that Connecticut courts "ha[d] embraced . . . for determining the presence of a fiduciary relationship." *Id.* at *12.

men's and women's basketball teams, had suffered knee injuries and were allegedly not provided adequate medical care and advice.  Civ. No. 21-13709, 2022 WL 1224959, at *7 (D.N.J. Apr. 26, 2022).  The court noted that it had "been unable to find[] any case decided by either the New Jersey Supreme Court or any lower courts of th[e] state which have held that there exists a fiduciary relationship between a university or coach and a student-athlete."  *Id.*

After briefing on the pending motions was complete, Plaintiff directed the Court's attention to a recent, unreported decision from the Superior Court of New Jersey in *Hornor v. Upper Freehold Regional Board of Education*, Docket No. MON-L-3887-21 (N.J. Super. Ct. Law Div. July 21, 2022).  The trial court in *Hornor* had found that a high school freshman who was fifteen years old at the time he was sexually abused by his science teacher could maintain a breach of fiduciary duty claim against the school district and teacher.  (ECF No. 34-1 at 24-35.)  Noting that "[t]he issue of whether a teacher or school district can have a fiduciary duty to a student is a question of first impression in New Jersey," the court compared the facts before it to the New Jersey Supreme Court's opinion in *F.G. v. MacDonell*, which had held that a clergy member has a fiduciary duty to a parishioner.  (*Id.* at 24-26 (citing 696 A.2d 697 (N.J. 1997)).)  The court deemed *F.G.* to weigh in favor of finding a fiduciary relationship because "a child is even more vulnerable than an adult parishioner seeking counseling and is unable to legally consent to a sexual relationship."  (*Id.* at 24-26.)  Looking to case law beyond New Jersey, the court wrote that it is "undisputed that courts across the nation at various levels have not reached a consensus."  (*Id.* at 27-33.)  Concluding that a school district and teacher should owe a minor student a fiduciary duty,

the trial court wrote that its "holding . . . is strictly limited to the circumstances set forth in [the plaintiff's] complaint, viewed generously and hospitably with every indulgence."[9]  (*Id.* at 34-35.)

Unlike *Hornor*, the present case does not involve allegations of sexual abuse directed at a child by the child's teacher.  And courts at all levels have recognized the distinction at law between children and adults in differing educational settings.  *See, e.g.*, *Hawkins v. Waynesburg Coll.*, Civ. No. 07-5, 2008 WL 2952888, at *5 (W.D. Pa. July 30, 2008) ("College students are quite unlike minor children, who are mandated by the States to attend public schools (or a substantial private equivalent), and whose parents by necessity tender their supervisory responsibilities for approximately seven hours during each school day."); *see also McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 242-243 (3d Cir. 2010) (recognizing in the First Amendment context that minor students in public education are owed "differing pedagogical goals" than adult students at post-secondary institutions and that public administrators sit in an *in loco parentis* role to the minor students in their care).  Thus, even setting aside that the trial court's ruling in *Hornor* is on appeal, the decision has limited applicability when considering whether a fiduciary relationship exists or should exist under New Jersey's common law between a university and its adult students.

Here, based on the lack of New Jersey legal authority that directly controls the factual circumstances, the Court is disinclined to find, for seemingly the first time under New Jersey law, that a fiduciary relationship exists between a university, university faculty, and a student—even when the allegations are as serious as those alleged.  This Court, sitting in diversity, is guided by Third Circuit precedent, which cautions that novel expansions of New Jersey's common law should ordinarily be left to New Jersey's Supreme Court, unless there is sound reason to believe

---

[9]    Shortly after the decision was issued, New Jersey's Appellate Division accepted an expedited interlocutory appeal, and to the Court's knowledge, that appeal remains pending.  (ECF No. 38 at 2-3.)

the expansion foreshadowed by existing precedent.  The case law that the Court has summarized above suggests that based on the specific facts of this case the issue remains unclear, and the precedent does not rise to the level where the expansion is necessarily foreshadowed.  Accordingly, the Court does not presently find a fiduciary relationship and duty related to the events alleged by Plaintiff.  *See Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (Federal courts "may not impose [their] own view of what state law should be."); *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) ("[W]here 'two competing yet sensible interpretations' of state law exist, 'we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [New Jersey] decides differently.'" (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002))); *see also Knelman*, 570 F. App'x at 68 (Plaintiff "concedes that Vermont courts have never found a fiduciary relationship between a college and its students but nonetheless urges us to recognize one here.  We are in no position to do so, for the existence of such a relationship is a matter of state law.").

Finally, because it is uncertain how Plaintiff's breach of fiduciary duty claims meaningfully differ from her gross negligence claims, dismissal of the fiduciary claims is unlikely to significantly impact the relief she would be afforded if she prevails.  *See Powell*, 2022 WL 1224959, at *8 ("[T]hese cases suggest an additional problem with Plaintiffs' breach of fiduciary duty claims: it is unclear what differentiates their fiduciary duty claims from their gross negligence claims. . . .  In other words, Plaintiffs' breach of fiduciary duty claims appear duplicative of each of their respective gross negligence claims."  (collecting cases)).

Therefore, Count Four for breach of fiduciary duty is dismissed without prejudice as against Princeton University and Professor Ryan.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, and other good cause shown, Defendants' Motions to Dismiss Plaintiff's Amended Complaint (ECF Nos. 18 & 19) are **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.

Dated:  December 29, 2023

*s/ Georgette Castner*
_____
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**